Good morning, Your Honors. I'm Allison Mendel for the defendant in this case, Anise Williams. Clearly, the fundamental issue that we're here on is ineffective assistance of counsel at the trial level. I want to focus on a couple of the government's arguments in response to that. First, their argument that ineffective assistance is rarely considered on direct appeal. And, of course, the answer to that is that's true except when the record is complete in order to decide the issue. Since all of our ineffective assistance – What was the ineffective assistance? Pardon me? What was the ineffective assistance? Well, that's the problem, Your Honor. It's the whole thing. It's the standard – The arguments, for example, based on medical – her medical situation, which, A, is not in the record much, and, B, what's the – what arguments should have been made about her medical situation? Well, it is in the record, Your Honor. It's not in the trial record. It's in the sentencing record. And that's part of the problem because the jury never saw it. Well, first of all – What would you have had the lawyer argue about? Well, first of all, our fundamental objection to his assistance of his client is putting her on as a witness under the circumstances. Putting the what? Deciding to put the defendant on as a witness on her own behalf. Do we know that he decided that? Well – Do we know that he decided that? No, we don't, Your Honor. But – And a client has the final control over that, is that right? Absolutely. On the other – Is that a classic reason why you can't explore this in 2255? You're telling us the big problem is he put her on the stand. Why? We have no idea. She may have demanded to go on the stand. Well, that's – that's generally true, Your Honor. But in this case, if, you know, if it was – He can't stop her. That's correct. And if it was her idea and not his, once she testified and it was clear how disastrous her testimony was, then if he had had no intention previous to that to put on medical evidence about her mental state, then he should have decided that he had to put on medical evidence for her mental state. She's not disastrous at all when she doesn't think that she's being surveilled by the police. She sounds pretty darn smart to me. I mean, she's measuring all of this, how not to get caught. Well, Your Honor, I think that there's a serious danger in this case, which was engaged in by counsel for the government, by the judge, by probation, by – over and over again, a sort of lay diagnosis of what was wrong with her. And we're not claiming, and she never claimed, that she can't form a coherent sentence or that she can't, for brief periods of time, have coherent conversations. You never – what's bothering me is this. You never exactly say what the defense should have been. What was the defense that should have been put on with regard to her medical evidence? Well, what comes out of the records that were eventually produced and analyzed in the course of sentencing, the best case is the somatoform disorder, which causes her to vacillate, to depend on others, to try to say what people want to hear. There's a whole list of symptoms that are listed at the sentencing stage, which would have been relevant. One of the things you would have to prove is that the judge would have let you put this on as a defense, right? Correct. But it's what counsel argued in his opening argument was that she had an extremely dependent personality and that she was under the influence of others. He made that argument. He was permitted to make that argument. He didn't try to put on the evidence that supported that argument. And, you know, in terms of looking to prejudice about the ineffective assistance of counsel, this Court only requires that there be a sentencing prejudice. And there clearly is a sentencing prejudice here, even if you look only at the imposition of an upward departure for her alleged perjury at trial. So that wouldn't have happened had she not testified. So that in itself is enough to show prejudice of the ineffective assistance. And, you know, I can't cite, you know, chapter and verse of which statement of counsel or which question counsel asked was the ineffective question, because if you read the entire transcript of his presentation of his client's testimony, the lawyer is nearly as bad as the client in terms of an inability to ask a question that wasn't objectionable, an inability to formulate an unobjectionable question after the objection, an inability to get his client to string together a coherent narrative, an inability to elicit or even apparently attempt to elicit the elements of the defenses that he said he was going to offer when he argued initially to the jury. He, in fact, says at the sentencing stage that he didn't have the medical issues clearly in his mind at the time of the trial, which I can't think what kind of a strategic decision that could have been not to understand what the medical evidence was, particularly since the trial record is replete with these requests for long lunches and delays as a result of her medical condition, which the judge becomes more and more irritated with, and ends up saying at the sentencing stage that she was clearly feigning all these illnesses through the trial in order to delay the trial and somehow escape the consequences of her act. And then both the judge and the government seem to quote the judge, quote the judge. Well, the pertinence is that the doctor who ultimately examined her in response to the judge's order at the sentencing stage said, oh, I don't think she has a somatoform disorder because that's characterized by making up ailments that you don't have. I think she has all these physical ailments, so she doesn't make them up. And this is at the same time the judge is saying she made up physical ailments all through her trial to try to delay her trial and somehow derail the finding of guilt. You really, the government can't have it both ways. I'm sorry. Firearms enhancement. I'm sorry. Could you say it again? Talk at all about the firearms enhancement. I probably should. Yes, the firearms enhancement, I think there is no demonstrated nexus between the firearms and the crime. The defendant says there is. The co-defendant? Yeah, Arthur Woods. Pardon me? He identifies these guns as being used to protect the counterfeiting operation. He doesn't say that in this case. No one testified in this case, either at trial or at sentencing. Where does this come from? No one had come to that. It's never enough. If somebody wanted to get it, really, we just need 15 guys in here with rifles and kill one of the dogs and then go in the house. That's the reason they're here. That's not in this case? No, no. I'm sorry. I didn't realize that's what you were citing, too. I don't know what that means. If you read that entire Judgment of what it means is what's all these guns and dogs all about. Well, if you read That's the reason they're here. If you read that entire taped conversation that the defendant turned informant had taped, it's impossible to tell what it is he's saying there, whether he's talking about the counterfeiting operation or something else. If you look at this whole thing in context and read what's said at trial about the lifestyle these people were living, he could easily and very likely be saying that we keep those dogs for protection. How many flipping guns do you have in here? Annise Williams, not enough. Vicki Shenanigan, not enough. No, when it comes to that, it's never enough. If somebody wanted to get it, really, they just need 15 guys in here with rifles and kill one of the dogs and then go in the house. And that's the reason they're here. Isn't that fair to assume from that? He's talking about why that's why we have all these No, it's not fair to assume that they were talking about the counterfeiting operation. First of all, you have to take into consideration that the counterfeiting equipment was not kept out there. It showed up out there the day before the search or two days before the search. It had been kept someplace else, and then the real bad guys ran off to Texas and left the computer with the Williams out in sight. Then, furthermore, if you look at the entire trial and the testimony of the lifestyle that they lived, they had a paranoid black helicopter view of life long before this whole counterfeiting operation ever happened. These 93 dogs were not purchased in connection with the counterfeiting operation. The guns, everyone concedes they had long before this counterfeiting operation. They lived a paranoid rural lifestyle that had nothing to do with the counterfeiting. And you have to assume that Mr. Williams is talking about counterfeiting when he's saying it's never enough. Or, and he said it's never enough, and he said, guys with rifles, that was their whole lifestyle. That wasn't the counterfeiting operation. And there's nothing else other than that one statement in the record that these guns had anything to do with the counterfeiting operation. Well, the judge concluded from all of this that they probably had to do with a lot of stuff, the rural lifestyle, but also to protect the illegal operation. You say there's simply nothing in the record to support that. Is that confused and ambiguous statement that Mr. Williams makes? All right. Well, let's hear from the government, and then you can respond. Thank you. May it please the Court. I'm Joanne Farrington, Assistant United States Attorney for the District of Alaska. Briefly, to address the first issue here, the government does agree that this Court very rarely considers on direct appeal claims of ineffective assistance to counsel. The government would have no objection if this Court declined to consider this issue at this point. But we would like to suggest that this is one case where, because the second prong of Strickland can't be met, that it may be appropriate for the Court, in the interest of judicial economy, to go ahead and decide the issue on merits. It does, the Court does occasionally do that in that situation, and it would be an effective way to dispose of the matter. On the other point, as to whether there's any other evidence in the record as to the intended use of the firearms, I think that there is, first of all, the fact that the two loaded weapons were found in the bedroom of Anise Williams, where the cash and the ledger and the other evidence of the crime were stored. That close proximity, possession and proximity, in and of itself, would be enough to, I think, suggest that the weapons were being kept in connection with the counterfeiting offense. But in addition to that, you have statements by her. Sotomayor, you said that there are certainly other reasons. Oh, there are. And the government absolutely does not dispute the fact that these folks lived in rural Alaska, where predators are an issue, and virtually everyone has guns. You might keep the gun next to your bed. That's true. But she also had the cash proceeds of her crime, plus the other evidence of the crime there as well. I think the statements of Arthur, you might be in trouble. It's not just statements of Arthur. There are also statements in the trial transcript by the other two co-defendants that previously the Williamses had made threatening statements and even brandished the weapons at times, indicating other crimes, not the counterfeiting. That's right. Vicki, in particular, I apologize for referring to these folks by their first names, but given the fact that most of them have the same last name, it makes it easier. Vicki, in fact, during her testimony said that one of the reasons she went out and taped or decided to tape her conversation with the Williamses was because she wanted to confirm the existence and location of the weapons for the authorities before they conducted the search because she was afraid someone would get killed because of previous threats that had been made by the Williamses. And that's really the only two points that I wanted to make at this point, unless you had questions. When the famous Arthur is talking about all of this, he says it. He doesn't say counterfeiting. What does it mean in that statement? They had just. Get it. I'm sorry. Oh, come and get it. Well, if you read the entire conversation, literally a few sentences before that, they started a discussion of how valuable the program, the computer, and the counterfeiting equipment was. And I think it's clear that the conversation just segued right into a discussion of how they were going to protect that, not to mention the fact that they intended to collect $30,000 in cash to be kept in their home in rural Alaska. Do you have anything else? That's it, unless there are other questions. Counsel. Thank you. You've got to respond. The podium is yours. Thank you, Your Honor. I'll try to be very brief. First of all, as to the government's argument that the second prong is not met, I think that's clearly not true as to the sentencing issues. She was prejudiced by her counsel's decisions. I think she was prejudiced all the way through. But the seating is true for the. . . No, no, no, not at all. Not at all. But I think that the prejudice is so clear on the sentencing issues that I don't see any other way. But that depends on, as I understand it, as you said it before, on her decision to take the stand, and that, as Judge Trott points out, is something we really don't know about. Well. About what happened. In other words, if you're talking about the medical evidence, it's a little less contention, but how is that connected up to the sentencing? Well, because the two things go hand in hand. Once she took the stand, there is no credible strategy for not putting on the medical evidence. If she was the one who decided that she had to testify and he didn't have anything to say about it, which is possible, then. . . If she had put on the medical evidence and if she had still been convicted, it wouldn't have had any effect on the sentencing, would it? Well, of course it would. If she had testified and said the incredible things that she did, and then there to, would the judge have said transparent perjury? And she deserves this enhancement for obstructing justice. And in that, I'm not clear on how he weighed the delay of the trial in that calculus, but that was clearly part of it. He basically said she lied about being sick, she lied about the facts, she lied about everything. The jury was so unconvinced that they laughed at her. And then counsel put on no evidence about her mental state. I don't think there's any inquiry we could conduct about why someone would do that. It doesn't make any sense. And you take that together with counsel's conduct of the actual trial itself, where he constantly says, I don't practice in Federal court, I don't know how to do this, I'm not sure what the rules of evidence are, he can't formulate a question. I mean, the whole thing taken together, you have to say, this couldn't have been any coherent strategy. I want to briefly address the firearms thing and what was in that conversation. What they were talking about protecting in that conversation was the CD and putting something on it so the CD couldn't be read if you didn't have a password or something. It had nothing to do with guns or physical protection. So all the talk about protection is talking about software. Well, but that's part of the counterfeiting program, isn't it? Yes, but they're protecting it with a password, not with a gun. So you can't... It segues into the, you just used the term, it segues into the same it. Well, then we have the informant who's taping the conversation saying, and by the way, how many guns do you have here anyway? How many flipping guns, what do you have? How many flipping guns do you have here? So she is trying to elicit a statement about how many guns they have here. They're not threatening, they're not brandishing, they're not, they're answering her question. That's as far as you can go with it. Thank you, counsel. Thank you. The case has already been submitted and we're finished for today. We'll be back tomorrow at 9 o'clock. All rise.
judges: Trott, Paez, Berzon